

David L. Scher, Esq.
dscher@employmentlawgroup.com
California Bar No. 184562
R. Scott Oswald, Esq. (to be admitted *pro hac vice*)
soswald@employmentlawgroup.com
The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Telephone: (202) 331-2883
Facsimile: (202) 261-2835

# IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA
### WESTERN DIVISION

|  |  |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* [UNDER SEAL],<br><br>  Plaintiff,<br><br>v.<br><br>[UNDER SEAL],<br><br>  Defendants. | Case No. _____<br>**FILED UNDER SEAL**<br>Pursuant to 31 U.S.C. § 3729<br>(False Claims Act) |

CV14-04133-RSWL (CWx)

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835



1   David L. Scher, Esq.
2   dscher@employmentlawgroup.com
   California Bar No. 184562
3   R. Scott Oswald, Esq. (to be admitted *pro hac vice*)
4   soswald@employmentlawgroup.com
   The Employment Law Group, P.C.
5   888 17th Street, NW, Suite 900
   Washington, D.C. 20006
6   Telephone: (202) 331-2883
7   Facsimile: (202) 261-2835

8

9       **IN THE UNITED STATES DISTRICT COURT**
     **FOR THE CENTRAL DISTRICT OF CALIFORNIA**
10           **WESTERN DIVISION**

11   UNITED STATES OF AMERICA *ex rel*
   KEITH PENNETTI
12   15C Via Plaza Nueva
13   Santa Fe, NM 87507

14
       Plaintiff,
15

16   v.

17   INTERFACE REHAB INC.,
   774 S. Placentia Ave, Suite 200
18   Placentia, CA 92870
19

20   LONGWOOD ENTERPRISES, INC.,
   LONGWOOD MANAGEMENT CORP.
21   4032 Wilshire Boulevard
22   Los Angeles, CA 90010

23
24   JOHN WAGNER
   3648 Motor Avenue, Unit 105
25   Los Angeles, CA 90034

26
      Defendants.
27
28

Case No. _____
**FILED UNDER SEAL**
Pursuant to 31 U.S.C. § 3729
(False Claims Act)

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

## Introduction

1.       Qui tam relator Keith Pennetti, by and through his attorneys, individually and on behalf of the United States of America, file this complaint against Interface Rehab Inc. ("Interface"), Longwood Enterprises, Inc., Longwood Management Corp. ("Longwood Management") and John Wagner to recover damages, penalties, and attorneys' fees for violations of the federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.*

2.       Pennetti worked for Interface as the Director of Rehabilitation.

3.       John Wagner, an Interface employee, was Pennetti's immediate supervisor.

4.       Interface contracts with Longwood Management to provide rehabilitation ("rehab") services at its facilities.

5.       Pennetti worked at Longwood Manor Convalescent Hospital ("Longwood Manor"), one of about twenty-one facilities run by Longwood Management.

6.       While at Longwood Manor, Pennetti immediately noticed that Interface and Longwood Management placed almost all its Medicare Part A patients on rehab therapy.

7.     Once those patients were placed on rehab therapy, Interface and Longwood Management assigned these patients to the highest levels of rehab therapy possible – resulting in significant Medicare reimbursements.

8.     After making some efforts to change the fraudulent practices and being rebuffed by management, Pennetti resigned from his position.

9.     Defendants violated the False Claims Act (31 U.S.C. § 3729) by (1) assigning nearly all of its Medicare Part A patients to rehab therapy (unnecessary services), (2) extending nursing stays (unnecessary services), (3) using licensed practitioners for unskilled services (unnecessary services), (4) placing almost all of its rehab patients on the highest and costliest forms of rehab therapy (upcoding), (5) conspiring to provide unnecessary services and upcode its services, and (6) failing to provide services for which they billed.

10.     In connection with the filing of this original Complaint, the Relator has furnished the United States with substantially all material evidence and information in the Relators' possession.

**Jurisdiction and Venue**

11.     This Court has subject matter jurisdiction over this action under 31 U.S.C. §§ 3730 and 3732.

12.     This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732 (a) because Defendants transacts business in this judicial district.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

13.     Venue is proper in this District pursuant to 31 U.S.C. § 3732 (a) and under 28 U.S.C. § 1391(c) because Defendants transacts business in the Western Division of this judicial district.

### Parties

14.     Relator Keith Pennetti is currently a resident of Santa Fe, New Mexico.

15.     Pennetti represents an "original source" of this information within the meaning of 31 U.S.C. § 3730(e)(4)(B), and states that to his knowledge, the information contained herein has not been publicly disclosed.

16.     Pennetti earned his Bachelor of Science in physical therapy in 1994.

17.     Following his six years of education, Pennetti proceeded to work at numerous facilities including:  Christus St. Vincent in Santa Fe, New Mexico; South Shore Neurologic Associates in Patchogue, New York; St. Charles Hospital in Port Jefferson, New York; and Ivy Rehab Network in East Meadow, NY.

18.     Of Pennetti's fifteen years of experience in physical therapy, ten of those years he served at the level of Director or above.

19.     Throughout his career, Pennetti always received good performance evaluations.

20.     In or about 1996, Pennetti became a Medicare credentialed provider and became more familiar with Medicare regulations over the course of his work experience.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

21.     Pennetti also performed some contract and consulting work for a skilled nursing home in Long Island, New York for several months and developed experience with the Medicare prospective payment system ("PPS).

22.     On or about July 2, 2012, Pennetti began working at Interface as the Director of Rehabilitation.

23.     Pennetti was responsible for providing physical therapy services, evaluating incoming patients to determine rehab levels, maintaining daily scheduling for Longwood Manor, maintaining daily documentation, updating service logs and Medicare prospective payment system ("PPS) worksheets, drafting weekly summaries, conducting monthly close outs in the rehab system, and running mandatory team and interdisciplinary team meetings.

24.     Pennetti attended daily meetings with the Longwood Administrator, and weekly meetings with the Longwood Administrator, the Director of Nursing, and the Business Office Manager.

25.     Thus, Pennetti has intimate knowledge of Defendants' fraudulent conduct through his professional responsibilities at Longwood Manor.

26.     Interface Rehab is a California corporation with its primary office located at 774 S. Placentia Avenue, Suite 200 in Placentia, California.

27.     Interface provides comprehensive (physical, occupational, and speech therapy) and consultation services on a long-term contractual basis to various medical settings throughout Southern California.

28.     Interface provides its clients with marketing strategies, assists with the development of cost-effective managed care strategies, designs rehab programs to meet a facilities and patient's needs, and "maximizes reimbursements" through its knowledge of Medicare/PPS regulations.

29.     Longwood Enterprises, Inc. is a California company with its primary office located at 4032 Wilshire Boulevard in Los Angeles, California.

30.     Longwood Enterprises, Inc. is the legal business name for Longwood Manor.

31.     Longwood Management Corporation is a California company with its primary office located at 4032 Wilshire Boulevard in Los Angeles, California.

32.     Longwood Management operates nursing homes and health care centers. It provides physical therapy, occupational therapy, and speech therapy and specialty care services.

33.     Pennetti believes that Longwood Management performed all Medicare billing for the rehab services.

34.     Pennetti was never involved in reviewing the bills to Medicare.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

5

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

35.     Longwood Management owns, manages, and operates about twenty-one facilities, including Longwood Manor.

36.     Longwood Manor is a skilled nursing facility located in Los Angeles.

37.     Longwood Manor has about 198 beds and accepts Medicare patients.

38.     John Wagner serves as the Regional Supervisor for Interface and was Pennetti's direct supervisor.

39.     Wagner trained Pennetti on Interface's various policies, oversaw and adjusted the levels of therapy at Longwood Manor, and ignored Pennetti's concerns about therapists clocking in for work but leaving the facility shortly thereafter.

<u>**Factual Allegations**</u>

*The Contract Between Interface and Longwood Management*

40.     Longwood Management hired Interface to manage its rehab therapy services for all of its twenty-one facilities.

41.     Under this contract, Longwood Management paid Interface between $1 and $1.25 per minute of therapy.

42.     Interface employees performed the rehab evaluations on patients, while Longwood Management employees continued to manage and perform all medical and nursing care for its patients.

**The Employment Law Group, P.C.**
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

43.     Though Interface managed the rehab therapy, Longwood Management was intimately involved with the determining the levels of rehab therapy to provide to each patient.

44.     On a daily basis, Pennetti met with the Longwood Administrator Karen (last name unknown)  and other Longwood administration team members to discuss topics and events that occurred in the last twenty-four hours, such as admissions, discharges, and injuries (these meetings were often referred to as "stand up" meetings).

45.     Pennetti would then pass along any information he received from these meetings to his Interface staff.

46.     On a weekly basis, Pennetti met with Karen, the Director of Nursing, and the Business Office Manager.

47.     The purpose of these meetings was primarily to ensure that patients were receiving the maximum amount of rehab therapy.

48.     During these meetings, Pennetti would read aloud the level of therapy that each patient was receiving, and the Business Office Manager would respond with the number of days left from the patient's Medicare Part A benefits.

***Rehab Therapy***

49.     Rehab therapy is classified by different Resource Utilization Group ("RUG") levels.

50.     This rehab category is further broken up into five sub-categories: low (RLx), medium (RMx), high (RHx), very high (RVx), ultra high (RUx).

51.     Generally, patients with a high level of independence are not good candidates for rehab therapy because there is simply no need or rationale for skilled therapy services.

52.     In most cases, patients with a high level of independence should not be placed on any type of rehab therapy.

53.     Conversely, patients who are extremely sick, unable to participate, and have a poor rehab prognosis are not good candidates for rehab therapy because they are unlikely to have a good outcome from the skilled therapeutic services.

54.     Long term nursing care may be more appropriate for extremely sick patients.

55.     The RUG level determines the amount of money per day that Medicare will pay for a patient's stay at the facility.

56.     Higher RUG levels command higher Medicare reimbursements. Individuals with

57.     HIV patients were particularly lucrative, as they command higher reimbursement rates.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

*Billing for Unnecessary Services*

58.    Defendants actively sought out homeless and disabled individuals that were subject to Medicare Part A coverage.

59.    The Longwood Management admissions coordinator and sometimes the Longwood Management Administrator herself would "market" to board and care homes.

60.    These marketing efforts were discussed during the daily stand-up meetings.

61.    The goal to place almost all Medicare Part A patients on rehab therapy was emphasized to Pennetti, and other employees, through Interface and Longwood's orientation and training materials.

> **PART A Medicare and UTILIZATION**
>
> Set a Goal of 100%
>
> *How is the Re-imbursement Determine
>     PPS utilizes the MDS which determines the RUG level which is the same as the Reimbursement
>     Rate that the facility will bill the Fiscal Intermediary
> PPS Prospective Payment System
>     1997-Balanced Budget Act

62.    As shown in the Longwood Management's document below, Defendants emphasized an expectation to place about 85-95% of Medicare Part A patients on rehab therapy.

63.    Wagner revised this document to change the percentage from 85-95% to 100%.

1he Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

| 11. | Rehab Operational Expectations Company-wide are as Follows: | |
| --- | --- | --- |
| Percentage of Available Medicare A on Case load | ~~85-95%~~ | *100%* |
| ~~Total Medicare Length of Stay Average (Facility-wide)~~ *Rehab + Nursing* | ~~30-41 Days~~ | |
| Upper Rehab RUG levels (RU/RV) | ~~78% or better of Total Medicare Days~~ | *RU- 75%. RV- 15%.* |
| RUG Breakdown goals of all Med A in the facility: | ~~70% RU;~~ ~~12% RV; 6% RH;~~ ~~15% RM and 8%~~ ~~RL~~ | |
| Part A Rehab Average LOS | ~~35-40 Days~~ | *38-42 days* |

64.     Once these patients were in the door, Defendants placed nearly all of the Medicare Part A patients on rehab therapy, regardless of the clinical needs of the patient.

65.     Pennetti witnessed several examples of Medicare Part A patients who should not have been placed on any level of rehab, especially not the highest level of rehab.

66.     Timothy Porter was able to climb and swing on therapy parallel bars.

67.     Porter also got into a fist fight with another patient.

68.     Defendants assigned Porter to ultra high rehab therapy.

69.     Linda Perkins was fully independent and exhibited a very high level of functioning.

70.     Defendants assigned Perkins to ultra high rehab therapy.

71.     Juan Triay was an HIV patient who could barely sit up on his own power for five minutes.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

72.     Triay is an example of a patient who should not have received any therapy because he was unable to participate in the therapy and he likely would not experience a good outcome from the treatment.

73.     Defendants assigned Triay to ultra high rehab therapy.

74.     Bradley Miller would walk to the nearby Hollywood neighborhood to get crystal methamphetamine and pace the halls for hours.

75.     Defendants assigned Miller to ultra high rehab therapy.

76.     John Green attended daily alcohol rehab meetings without any assistance.

77.     Defendants assigned Green to ultra high rehab therapy.

78.     Additionally, Defendants often extended the number of days that a patient would stay at the facility, in order to continue collecting high Medicare reimbursements.

79.     During Pennetti's weekly meetings with Karen, the Longwood Administrator, Pennetti was required to disclose any patients that his rehab team wanted to discharge from rehab therapy.

80.     When Pennetti requested to discharge a patient but the patient had not exhausted his Medicare Part A insurance, Karen often responded "keep them on a little longer" or words similar.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

81.     If Pennetti disagreed with Karen, Wagner would call Pennetti on his cell phone to discuss the patient or would change the length of the patient's stay in the computer system, without physically examining the patient.

82.     On average, Medicare Part A patients stayed at Longwood Management's facilities for approximately forty-five days.

83.     Since Defendants admitted patients at very high functional levels, even a short stay for an independent person would be considered excessive.

84.     Defendants also used their licensed practitioners to provide unskilled services to patients that could have completed at a lower rate by nurses or other staff.

85.     When a patient does not require the specific skills or qualifications of a licensed therapist, most of the patients' needs may be met by nurses or aides.

86.     Defendants could have met the needs of the patients by using Longwood nurses, but assigned the patients to work with licensed Interface therapists to increase daily Medicare reimbursement rates.

*Upcoding*

87.     Defendants assigned almost all of its Medicare Part A patients on the highest levels of rehab therapy, regardless of the clinical need for such services.

88.     Despite the specific process and considerations required to determine the appropriate RUG level, Interface's orientation documents instructed its employees to "Start with Rehab Ultra High and go from there."

IV. PPS Worksheet → (check MDS Part A Tracking Log)
- Rehab Optima
    a. Projections (all Insurances)
    b. ARD identified
    c. MDS Report → section P & T
       From Rehab Optima, but minutes still double checked from chart
    d. Assignment Board is possible
  **Strategy → Start with Rehab Ultra High and go from there.

89.   Additionally, when therapists, such as Pennetti, evaluated incoming patients, Defendants did not allow therapists to designate any RUG level other than the ultra high level.

90.   If a therapist attempted to lower the RUG level, this would spark immediate review and conversation with the Longwood Administrator and the Interface Regional Manager.

91.   This is contrary to the therapist's job to evaluate patients and determine their clinical needs.

92.   Pennetti also believes that Defendants instructed the nurses to align the Activities of Daily Living ("ADL") scores to match the high rehab classifications as to not create a conflict, regardless of whether or not a patient could perform the daily functions.

93.   Pennetti would often see patients that were fully independent on all of the ADL levels assigned to high levels of rehab.

94.   Pennetti assumes that the nurses coded patients at these high levels of dependence to match the rehab levels.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

95.   For example, if a nurse evaluated a patient and determined that the patient could dress and feed themselves, it would not make sense for Defendants to then assign that patient to rehab therapy for improving dressing and feeding abilities.

96.   One of the patients that Pennetti observed, Timothy Porter, was able to climb and swing on therapy parallel bars and he also got into a fist fight with another patient.

97.   Despite Porter's fully functioning level, Defendants assigned Porter to ultra high rehab.

98.   Pennetti lowered Porter's level of therapy from ultra high to very high.

99.   In an e-mail, copying several Interface executives, Wagner increased Porter's rehab level, and also increased the rehab levels of other patients.

**Longwood Manor - PPS Projections**

John Wagner

**Sent:** Tuesday, August 07, 2012 1:22 PM

**To:** longwooddor

**Cc:** Gheith Effarah; Danny Nguyen; Ashwin Shah

Keith,

I have reviewed your current projections. The following is my feedback:

- Linda Perkins: Please ensure that 720 mins have been given by the 5-day ARD on 8/6/12 in order to achieve the RU RUG level.
- Timothy Porter: I have increased PT and OT minutes throughout the rest of this week in order to increase the RUG utilization. Please call me to discuss this change.
- Bernard Smith: I have projected a 30-day RU on 8/8/12.
- Janet Stewart: I have altered the 30-day ARD to 8/14/12.
- Juan Triay: I have altered the 30-day ARD to be a RU on 8/18/12.

**John B. Wagner, RPT**
Senior Regional Mentor
Interface Rehab, LLC

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

100.   However, Wagner and the Interface executives did not physically examine Porter, or any of the other patients listed in the e-mail.

101.   They had no clinical justification to alter the RUG levels, other than to increase the reimbursement rate.

102.   As shown in Interface weekly statistics report for September 9, 2012, of Longwood Manor's 22 Medicare Part A patients, Defendants assigned 17 of those patients to ultra level rehab therapy, and 4 patients to very high rehab therapy.



103.   Defendants assigned none of the patients to low, medium or high rehab therapy.

104.   The Crenshaw Nursing Home, another facility operated by Longwood Management, was located directly across the street from Longwood Manor.

105.   Pennetti would occasionally work at the Crenshaw facility if it was short on staff.

106.   Pennetti witnessed the same fraud at this facility.

107.   The Crenshaw facility contained almost no rehab therapy equipment or gym space.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

108. The Crenshaw facility billed for high levels of rehab therapy despite having patients that were highly functional and did not need the therapy.

109. The Crenshaw facility also billed for treatments to patients that were not appropriate for such high levels of therapy (i.e. chronic bed bound or semi-comatose).

110. Non-skilled long-term nursing care was more appropriate for these type of patients.

111. According to the September 9, 2012 weekly statistics report, Crenshaw had only three Medicare Part A residents, two of which were placed on the ultra high rehab therapy.

112. However, these Medicare Part A patients stayed at the facility an average of approximately 82 days – the longest amount of time of all Longwood facilities and significantly over the Longwood Management average of 45 days for all its facilities.

113. As shown in Interface's weekly statistics report for September 9, 2012 of the 300 patients at all Longwood Management facilities, Longwood Management assigned 220 of those patients to ultra level rehab therapy, 58 patients to very high, 10 patients to high, 6 patients to medium, and 0 patients to low.

| | | | | Breakdown of # of Residents by RUG Levels | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | # of Eligible Part A Residents on Census | # of Part A Residents Never on Rehab Caseload | # of Part A Residents on Caseload this week | | RU | RV | RH | RM | RL |
| Total >>> | 300 | 0/300 | 294/300 | | 220 | 50 | 19 | 6 | 0 |

*Conspiracy*

114.   Interface and Longwood Management conspired to place almost all of its rehab patients on the highest and costliest forms of rehab therapy.

115.   Interface employees, mainly through John Wagner, were implementing Interface corporate policies, some of which are outlined in the training and orientation documents.

116.   Longwood Management's employees, mainly through the Longwood Administrator, were also implementing its corporate policies.

117.   Longwood Management was also responsible for billing to Medicare.

118.   While Interface managed the rehab therapy, Longwood Management's employees frequently met with Interface employees primarily to ensure that the patients were receiving the maximum amount of therapy possible.

119.   Thus, both Longwood Management and Interface entered into a conspiracy to obtain high Medicare reimbursements through fraudulently high levels of rehab therapy for almost all of its patients.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

*Billing For Deficient Services Or Services Never Provided*

120.   Although according to Defendants' weekly statistics reports, the majority of patients should have been receiving 144 minutes of therapy per day (for ultra high therapy), this rarely occurred.

121.   Often the physical therapists allowed patients to play a few minutes of Nintendo Wii, and then spend the rest of the time reading a magazine.

122.   Just as frequently, the therapists would not bring the patients out of their rooms and sometimes, therapists would not see the patients at all.

123.   In one situation, Pennetti witnessed a PRN ("PRN" or "pro re nata," means the employee works only on an "as needed" basis) physical therapy assistant, James An ("James"), clocking in to see a patient, and then leaving shortly thereafter, without seeing the patient.

124.   To confirm that James was not at the facility, Pennetti called James's cell phone and asked him to report to his office immediately.

125.   James admitted that "he went out for a minute" and would come back as soon as he could.

126.   Pennetti saw no evidence of James clocking out for the day.

127.   To Pennetti's surprise, this type of behavior continued on a routine basis.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

128.   When Pennetti raised this issue with Wagner, Wagner told Pennetti that James was a valued employee and to let him know if he "keeps it up" or words similar.

129.   Additionally, on Pennetti's first day at work, he was still an applicant for a physical therapist's license in California.

130.   Under California physical therapy board regulations, until Pennetti's license was issued, he could perform physical therapy services only while under supervision; Interface was fully aware of this requirement.

131.   On his first day, after receiving a quick round of introductory training, Defendants left Pennetti unsupervised to perform physical therapy services on several patients.

132.   That afternoon, Pennetti called his supervisors and notified them that he refused to treat patients without appropriate supervision.

133.   When Pennetti left, he did not see any therapists present at the facility, yet about two days later, he noticed that therapy was documented for the patients that he refused to see.

134.   The documentation for these patients was not in the normal chronological order, and thus Pennetti believes that these patients never received any rehab therapy, but Defendants billed for these services anyway.

135.   This lack of appropriate supervision went on for several weeks.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

136. Interface managers assured Pennetti that "phone supervision" was adequate.

***Pennetti Resigns***

137. On or about September 24, 2014, Pennetti submitted his notice of resignation.

## Count I
### Violation of the False Claims Act 31 U.S.C. § 3729(a)(1)(A)
### (against Defendant Interface)

138. Relator re-alleges and incorporates the allegations set forth above as though fully alleged herein.

139. Defendant Interface, by and through its officers, agents, supervisors, and employees, knowingly presented or caused to be presented to the government and its officials, false or fraudulent claims in order to obtain payment or approval from the government, in violation of 31 U.S.C. § 3729(a)(1)(A).

140. Interface knowingly presented or caused to be presented claims to obtain payment for deficient services or services never provided.

141. Interface's weekly statistics reports shows that the majority of the Medicare Part A patients at Longwood Management facilities were receiving the highest level of rehab therapy, amounting to approximately 144 minutes of therapy per day.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

142.   However, Interface rarely provided 144 minutes of rehab therapy to the patients assigned to ultra high rehab therapy.

143.   Yet Interface, Longwood Enterprises, Inc., and Longwood Management, billed Medicare for ultra high rehab therapy services, which the patients were not actually receiving.

144.   The result of Interface's actions has led to the federal government pay for services that it never received.

145.   The United States of America has been damaged by all of the aforementioned misrepresentations and failures to comply with requisite laws and regulations in an as of yet undetermined amount.

### Count II
### Violation of the False Claims Act 31 U.S.C. § 3729(a)(1)(B)
### (against Defendant Interface)

146.   Relator re-alleges and incorporates the allegations set forth above as though fully alleged herein.

147.   Interface, by and through its officers, agents, supervisors, and employees, knowingly presented or caused to be presented to the government and its officials, false records or statements material to false or fraudulent claims and knowingly failed to disclose material facts, in order to obtain payment or approval from the government, in violation of   31 U.S.C. § 3729(a)(1)(B).

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

148. Interface's fraud violated a material condition of the payment for claims when it failed to comply with Medicare's compliance regulations which include proper use of appropriate, medically necessary procedures and consideration of a patient's needs in care decisions.

149. Interface made false statements to the government by working with Longwood Management to bill Medicare for rehab services that were not medically necessary, and also by upcoding all of its rehab services to the highest possible level regardless of the patient's clinical needs.

150. Interface knowingly presented these false claims, as it provided training materials to its employees emphasizing a 100% Medicare usage goal.

151. These training materials also instruct employees to "start from ultra high and go from there" in regards to the level of rehab therapy to assign to each patient.

152. Interface's weekly statistics reports of Longwood Management's facilities show an overwhelming number of patients placed on the highest levels of rehab therapy, demonstrating evidence that such designation was done without regard to patient's needs and with the intent of defrauding Medicare.

153. Longwood Enterprises, Inc. and Longwood Management's employees frequently met with Interface employees primarily to ensure that patients were receiving the maximum amount of therapy possible.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

154.    When Pennetti attempted to lower the rehab levels for certain patients, his supervisor, an Interface employee, rejected his request and raised the levels of rehab therapy – even though his supervisor did not physically examine the patients.

155.    The result of Interface's actions has led to the federal government paying for unnecessary services and paying for more expensive services than necessary.

156.    The United States of America has been damaged by all of the aforementioned misrepresentations and failures to comply with requisite laws and regulations in an as of yet undetermined amount.

### Count III
**Violation of the False Claims Act 31 U.S.C. § 3729(a)(1)(A)**
**(against Defendants Longwood Enterprises, Inc. and**
**Longwood Management Corp.)**

157.    Relator re-alleges and incorporates the allegations set forth above as though fully alleged herein.

158.    Defendants Longwood Enterprises, Inc. and Longwood Management, by and through their officers, agents, supervisors, and employees, knowingly presented or caused to be presented to the government and its officials, false or fraudulent claims in order to obtain payment or approval from the government, in violation of 31 U.S.C. § 3729(a)(1)(A).

159.    Longwood Enterprises, Inc. and Longwood Management billed Medicare for deficient services or series never provided.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

160.   Interface's weekly statistics reports of shows that the majority of the Medicare Part A patients at Longwood Management facilities were receiving the highest level of rehab therapy, amounting to approximately 144 minutes of therapy per day.

161.   However, Interface, Longwood Enterprises, Inc.,  Longwood Management rarely provided patients on ultra high rehab with 144 minutes of rehab therapy.

162.   Yet Interface, Longwood Enterprises, Inc., and Longwood Management, billed Medicare for ultra high rehab therapy services, which the patients were not actually receiving.

163.   The result of Longwood Enterprises, Inc. and Longwood Management's actions has led to the federal government paying for services that it never received.

164.   The United States of America has been damaged by all of the aforementioned misrepresentations and failures to comply with requisite laws and regulations in an as of yet undetermined amount.

### Count VI
**Violation of the False Claims Act 31 U.S.C. § 3729(a)(1)(B)
(against Defendants Longwood Enterprises, Inc. and
Longwood Management Corp.)**

165.   Relator re-alleges and incorporates the allegations set forth above as though fully alleged herein.

166.   Defendants Longwood Enterprises, Inc. and Longwood Management, by and through its officers, agents, supervisors, and employees, knowingly presented or caused to be presented to the government and its officials, false records or statements material to false or fraudulent claims and knowingly failed to disclose material facts, in order to obtain payment or approval from the government, in violation of 31 U.S.C. § 3729(a)(1)(B).

167.   Longwood Enterprises, Inc. and Longwood Management's fraud violated a material condition of the payment for claims when it failed to comply with Medicare's compliance regulations which include proper use of appropriate, medically necessary procedures and consideration of a patient's needs in care decisions.

168.   Longwood Enterprises, Inc. and Longwood Management made false claims to the government by billing Medicare for rehab services that were not medically necessary, upcoding almost all of its rehab therapy to the highest possible level regardless of the patient's clinical needs, and unnecessarily extending patient's stays.

169.   Longwood Enterprises, Inc. and Longwood Management knowingly presented these false claims when its employees met on a weekly basis with Interface employees to ensure that patients were receiving the maximum amount of rehab therapy.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

170.   A document outlining Longwood's Management Standards reference an expectation to place about 100% Medicare Part A patients on rehab therapy.

171.   Interface's weekly statistics reports of Longwood Management's twenty-one facilities show an overwhelming number of patients placed on the highest levels of rehab therapy, demonstrating evidence that such designation was done without regard to patients' needs and with the intent of defrauding Medicare.

172.   When Pennetti requested to discharge a patient but the patient had not exhausted his Medicare Part A insurance, the Longwood Administrator often responded "keep them on a little longer" demonstrating Longwood Enterprises, Inc. and Longwood Management's intent to extend the length of a patient's stay without regard to patients' needs.

173.   The results of Longwood Enterprises, Inc. and Longwood Management's actions have led to the federal government paying for unnecessary services and paying for more expensive services than necessary.

174.   The United States of America has been damaged by all of the aforementioned misrepresentations and failures to comply with requisite laws and regulations in an as of yet undetermined amount.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

<u>Count V</u>
**Violation of the False Claims Act 31 U.S.C. § 3729(a)(1)(B)**
**(against Defendant John Wagner)**

175.   Relator re-alleges and incorporates the allegations set forth above as though fully alleged herein.

176.   Defendant Wagner knowingly presented or caused to be presented to the government and its officials, false records or statements material to false or fraudulent claims and knowingly failed to disclose material facts, in order to obtain payment or approval from the government, in violation of 31 U.S.C. § 3729(a)(1)(B).

177.   Wagner's fraud violated a material condition of the payment for claims when he failed to comply with Medicare's compliance regulations which include proper use of appropriate, medically necessary procedures and consideration of a patient's needs in care decisions.

178.   Wagner made false claims to the government when he instructed Longwood Management staff, Interface staff, and Pennetti to unnecessarily place almost all Medicare Part A patients to rehab therapy services, upcode the level of therapy for patients, and extended nursing stays for patients.

179.   Wagner knowingly presented these false claims, as he provided Interface and Longwood Management's training materials to Pennetti emphasizing a 100% Medicare usage goal.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

180.   On a Longwood Management document which listed its expectation to place 85-95% of Medicare Part A patients on rehab therapy, Wagner revised the percentage to 100%.

181.   When Pennetti attempted to lower the rehab levels for certain patients, Wagner rejected his request and raised the levels of rehab therapy – even though Wagner did not physically examine the patients.

182.   When Pennetti attempted to discharge a patient that had not exhausted his Medicare Part A insurance, Wagner would often call Pennetti on his cell phone to discuss the patient or would change the length of the patient's stay in the computer system, without physically examining the patient.

183.   When Pennetti noticed a physical therapy assistant clocking out and leaving the facility shortly thereafter, Pennetti reported the incident to Wagner.

184.   Wagner did nothing to address or correct the fraud, but told Pennetti only to let him know if behavior continued.

185.   Wagner also left Pennetti unsupervised to treat patients, even though Wagner knew that Pennetti was not yet licensed and required direct supervision.

186.   The results of Wagner's actions have led to the federal government paying for unnecessary services and paying for more expensive services than necessary.

187.   The United States of America has been damaged by all of the aforementioned misrepresentations and failures to comply with requisite laws and regulations in an as of yet undetermined amount.

## Count VI
### Violation of the False Claims Act 31 U.S.C. § 3729(a)(1)(C) (Conspiracy) (against Defendants Interface, Longwood Enterprises, Inc. and Longwood Management)

188.   Relator re-alleges and incorporates the allegations set forth above as though fully alleged herein.

189.   Defendants Interface, Longwood Enterprises, Inc. and Longwood Management violated the False Claims Act, 31 U.S.C. § 3729(a)(1)(C), when they conspired to knowingly presents or caused to be presented, false claims to the government through Medicare.

190.   Interface, Longwood Enterprises, Inc., and Longwood Management conspired to place almost all of their rehab patients on the highest and costliest forms of rehab therapy.

191.   Interface employees, mainly through John Wagner, were implementing Interface corporate policies, some of which are outlined in the training and orientation documents.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

192.   Longwood Enterprises, Inc. and Longwood Management's employees, mainly through the Longwood Administrator, were also implementing its corporate policies.

193.   Longwood Enterprises, Inc. and Longwood Management's employees frequently met with Interface employees primarily to ensure that patients were receiving the maximum amount of therapy possible.

194.   Longwood Enterprises, Inc., Longwood Management and Interface entered into a conspiracy to obtain high Medicare reimbursements through fraudulently high levels of rehab therapy for almost all of its patients.

195.   Longwood Management was responsible for billing to Medicare.

196.   Longwood Enterprises, Inc., Longwood Management and Interface's actions have led to the federal government paying for unnecessary services and paying for more expensive services than necessary.

197.   The United States of America has been damaged by all of the aforementioned misrepresentations and failures to comply with requisite laws and regulations in an as of yet undetermined amount.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

## PRAYER FOR RELIEF

WHEREFORE, the Relator Keith Pennetti, acting on behalf of, and in the name of, the United States of America and on his own behalf, prays that judgment be entered against Defendants for violations of the False Claims Act as follows:

(a) In favor of the Relator for the maximum amount pursuant to 31 U.S.C. § 3730(d) to include reasonable expenses, attorney's fees, and costs incurred by the Relator;

(b) In favor of the United States against Defendants for treble damages to the federal government from the submission of false claims, and the maximum civil penalties for each violation of the False Claims Act;

(c) Any other such relief that the Court may deem just and equitable.

1

2

3

4  May 20, 2014

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

Respectfully submitted,
THE EMPLOYMENT LAW GROUP, P.C.

By: _____

David L. Scher, Esq.
dscher@employmentlawgroup.com
California Bar No. 184562
R. Scott Oswald, Esq. (to be admitted
*pro hac vice*)
soswald@employmentlawgroup.com
The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Telephone: (202) 331-2883
Facsimile: (202) 261-2835

Attorneys for *Qui Tam* Plaintiff

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served via UPS, on this 20th day of May 2014, upon:

Eric Holder, Esq.
Attorney General of the United States
Office of the Attorney General, Civil Division
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC  20530-0001

Andre Birotte, Esq.
United States Attorney General
United States Attorney's Office
Central District of California
312 North Spring Street, Suite 1200
Los Angeles, California 90012

John Lee, Esq.
Assistant United States Attorney
United States Attorney's Office
Central District of California
300 N. Los Angeles St.
Los Angeles, California 90012


_____
David L. Scher, Esq.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835